**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| MICHAEL SALAZAR, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>PARAMOUNT GLOBAL, d/b/a 247SPORTS,<br><br>      Defendant. | **Case No. 3:22-cv-756**<br><br>**Judge Eli J. Richardson**<br><br>**Magistrate Judge Alistair E. Newbern** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**(FILED IN RESPONSE TO ECF NOS. 16, 17)**

"By installing the Pixel, Defendants opened a digital door and
invited Facebook to enter that door and extract information within."[1]

---

[1] *Czarnionka v. The Epoch Times Ass'n, Inc.*, No. 22-cv-6348, 2022 WL 17069810, *2
(S.D.N.Y. Nov. 17, 2022).

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................ ii

**Introduction** ....................................................................................................... 1

**Legal Standard on Fed. R. Civ. P. 12(b)(6) Motion to Dismiss** ............................. 3

**Argument** ........................................................................................................... 3

    **A. Plaintiff Has Plausibly Pleaded His VPPA Claim.** ....................................... 4

        **1. Paramount is a Video Tape Service Provider as defined in the VPPA.** .......... 4

        **2. Mr. Salazar has plausibly plead that he is a "consumer" of a "good or service" under the VPPA.** ....................................................................... 6

        **3. The Facebook ID – on its own – constitutes PII.** ...................................... 8

    **B. Paramount knowingly held the door open for Facebook to walk right in and access Mr. Salazar's PII.** ......................................................................... 9

    **C. Mr. Salazar has standing to pursue the VPPA claims.** ................................ 10

        **1. The harm Mr. Salazar has alleged is concrete and particularized.** .............. 10

        **2. There is No Content Exception in the VPPA.** ...................................... 16

        **3. Paramount's Browsewrap "Privacy Policy" Has No Application Here.** ...... 17

        **4. Traceability** ..................................................................................... 20

**Conclusion** ...................................................................................................... 21

# TABLE OF AUTHORITIES

Cases

*Al-Ahmed, v. Twitter*,
No. 21-CV-08017-EMC, 2023 WL 27356 (N.D. Cal. Jan. 3, 2023) .................................... 13

*Ambrose v. Boston Globe Media Partners LLC*,
No. 21-cv-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022) ...................... 2, n.4, 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................. 3

*Austin-Spearman v. AMC Network Entm't LLC*,
98 F.Supp.3d 662 (S.D.N.Y. 2015) ................................................................................. 7, 12

*Boelter v. Hearst Commc'ns*, Inc.,
192 F. Supp. 3d 427, 437 (S.D.N.Y. 2016) .................................................................... 13-14

*Bohnak v. Marsh & McLennan Cos., Inc.*,
580 F. Supp. 3d 21, 30 (S.D.N.Y. 2022) .......................................................................... 13

*Buchholz v. Meyer Njus Tanick, PA*,
946 F.3d 855, 861 (6th Cir. 2020) ..................................................................................... 13

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) ..................................................................................... n.10

*Belozerov v. Gannett Co.*,
No. 22-cv10838, 2022 WL 17832185 (D. Mass. Dec. 20, 2022) .................................... 2, n.4

*Coulter-Owens v. Time Inc.*,
695 F. App'x 117 (6th Cir. 2017) .................................................................................. 13-14

*Czarnionka v. The Epoch Times Ass'n, Inc.*,
No. 22-cv-6348, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ............................ 1, n.4, 8-9

*Doe v. Meta Platforms, Inc.*,
No. 3:22-cv-03580 (N.D. Cal.) ......................................................................................... 1

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .................................................................................. 11, 16-17

*Franchi v. SmileDirectClub, Inc.*,
No. 3:19-CV-00962, 2022 WL 4594575 (M.D. Tenn. Sept. 30, 2022) ............................. 3

i

*Freeplay Music v. Dave Arbogast Buick-GMC*,
No. 3:17-cv-42, 2019 WL 4647305 (S.D. Ohio Sept. 24, 2019) ................................... 17

*Hunstein v. Preferred Collection & Mgmt. Servs.*,
48 F.4th 1236 (11th Cir. 2022) ...................................................................... 15

*In re Hulu Privacy Litig.*,
No. C 11-3764, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ......................................... 4

*In re Nickolodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016) ..........................................................................11

*In re Vizio, Inc., Consumer Privacy Litigation*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ............................................................. 4-5

*Krassick v. Archaeological Inst. of Am.*,
No. 2:21-cv-180, 2022 WL 2071730 (W.D. Mich. June 9, 2022) ................................. 14

*Lebakken v. WebMD*, LLC,
No. 1:22-cv-644, 2022 16716151 (N.D. Ga. Nov. 4, 2022) ..................................... 2, 6-7

*Louth v. NFL Enters. LLC*,
No. 1:22-cv-405, 2022 WL 4130866 (D.R.I. Sept. 12, 2022) ......................................... 2

*McCallahan v. Medicredit, Inc.*,
No. 3:19-cv-163, 2020 WL 6204419  (M.D. Tenn. Oct. 22, 2020) ................................ 15

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66, 77 (2d Cir. 2017) ...................................................................... 19

*Moeller v. Am. Media, Inc.*,
235 F. Supp. 3d 868, 873-75 (E.D. Mich. 2017) ................................................ 13-14

*Moskal v. United States*,
498 U.S. 103 (1990) .............................................................................. n.5

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ...................................................................... 17

*Perlin v. Time Inc.*,
237 F. Supp. 3d 623 (E.D. Mich. 2017) ............................................................ 13

*Perry v. Cable News Network, Inc.*,
854 F.3d 1336 (11th Cir. 2017) ............................................................. n.10, 11

*Pratt v. KSE Sportsman Media, Inc.*,
    586 F. Supp. 3d 666 (E.D. Mich. 2022) ....................................................... n.12

*Rendon v. Cherry Creek Mortg, LLC*,
    No. 22-CV-01194-DMS-MSB, 2022 WL 17824003 (S.D. Cal. Dec. 20, 2022) ............. 15

*Reno v. Koray*,
    515 U.S. 50 (1995) .. ......................................................................................... n.5

*Snap-on Business Solutions v. O'Neil & Associates*,
    708 F. Supp. 2d 669 (N.D. Ohio 2010) .. ............................................................ 17

*Specht v. Netscape Communications Corp.*,
    306 F.3d 17 (2d Cir. 2002) .... .......................................................................... 17

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 ................................................................................................... 13

*Sterk v. Redbox Automated Retail, LLC*,
    806 F. Supp. 2d 1059 (N.D. Ill. 2011) ............................................................... n.5

*Sterk v. Redbox Automated Retail, LLC*,
    672 F.3d 535 (7th Cir. 2012) ........................................................................... n.5

*Stewart v. Healthcare Revenue Recovery Group, LLC*,
    No. 3:20-cv-679, 2022 WL 200371 (M.D. Tenn. Jan. 21, 2022) ................................ 14

*Sputz v. Alltran Fin., LP*,
    No. 21-cv-4663, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) ................................... 15

*TransUnion v. Ramirzez*,
    141 S. Ct. 2190 (2021) .............................................................................. 12, n.12

*United States v. Shultz*,
    No. 16-10107-01-EFM, 2018 WL 534333 (D. Kan. Jan. 24, 2018) ............................ 7-8

*Walker v. Nautilus, Inc.*,
    541 F. Supp. 3d 836, 841 (S.D. Ohio 2021) ..................................................... 17-18

*Ward v. Nat'l Patient Account Servs. Solutions*,
    9 F.4th 357 (6th Cir. 2021) ......................................................................... 10, 12

*Wilson v. Playtika, Ltd.*,
    349 F. Supp. 3d 1028 (W.D. Wash. 2018) ........................................................... 17

Statutes

18 U.S.C. § 2710 ................................................................................................ *passim*

Mich. Comp. Laws Ann. § 445.1711 ........................................................................ 8

Tenn. Code Ann § 47-18-2203 ................................................................................. 8


Other Authorities

134 Cong. Rec. S5397-10 (1988) ............................................................................. 8

247Sports.com, https://247sports.com ................................................................ *passim*

Facebook Health Tracking Claim Shocking If True, Judge Says, Law360, available at
https://www.law360.com/articles/1548383/facebook-health-tracking-claim-shocking-if-true-
judge-says ................................................................................................................ 1

Internet Archive (*aka*, Wayback Machine) ............................................................ 19

The Video Privacy Protection Act—Eleventh Circuit Limits the Scope of "Subscriber" for VPPA
Protections—Ellis v. Cartoon Network, Inc., 803 F.3d 1251 (11th Cir. 2015), 129 Harv. L. Rev.
2011, 2018-19 (2016) .............................................................................................. 16

S. Rep. No. 100-599 ................................................................................................. 8

iv

## INTRODUCTION

This case presents a straightforward privacy claim based on a straightforward privacy statute. Defendant Paramount Global d/b/a 247Sports ("Paramount") is a publicly traded multinational media conglomerate, the parent company of 247Sports, and the owner and operator of www.247Sports.com. ECF No. 1, ¶ 13.

Paramount installed on its website a tracking product developed by Meta Platforms Inc., formerly known as Facebook Inc., called "the Pixel." The Pixel is a small bit of computer code that collected and disclosed to Meta personally identifiable information about the subscribers using Paramount's website and the actions that they take on it. Among other things, the Pixel transmits the titles of videos users request or obtain, together with the viewer's "Facebook ID," a unique identifier anyone can use to look up the viewer's Facebook profile, which contains detailed information about the subscriber. While Defendant characterized this matter as the common use of a marketing tool, Judge Orrick recently commented in another Pixel matter dealing with the sharing of internet browsing data that "I think that is a kind of thing that a reasonable Facebook user, would be shocked to realize."[2] The same is true here, reasonable users of 247sports.com do not expect that Paramount is sharing their personal information with third parties like Facebook and especially do not expect the scope and breadth of disclosure.

"The VPPA prohibits video tape service providers from knowingly disclosing 'personally identifiable information concerning any consumer of such provider[.]" *Czarnionka v. The Epoch Times Ass'n, Inc.*, No. 22-cv-6348, 2022 WL 17069810, *2 (S.D.N.Y. Nov. 17, 2022). "To state a claim under the VPPA, 'a plaintiff must allege that '[a] video tape service provider . . .

---

[2] *Doe v. Meta Platforms, Inc.*, No. 3:22-cv-03580 (N.D. Cal.). *See also* Facebook Health Tracking Claim Shocking If True, Judge Says, Law360, available at https://www.law360.com/articles/1548383/facebook-health-tracking-claim-shocking-if-true-judge-says (last visited January 4, 2023).

1

knowingly disclose[d], to any person, personally identifiable information concerning any consumer of such provider.'" *Ambrose v. Boston Globe Media Partners LLC*, No. 21-cv-10810-RGS, 2022 WL 4329373, *2 (D. Mass. Sept. 19, 2022) (citation omitted).[3]

Just as the plaintiffs in *Epoch Times* and *Boston Globe* did, here Plaintiff Salazar has plausibly plead the following:

- Plaintiff Michael Salazar was a 247's newsletter subscriber and, during that time, was also a Facebook user. ECF No. 1, ¶¶ 12, 20, 46-47.

- Whenever he watched a video on 247sports.com, 247 transmitted to Facebook via the Pixel the video's title and Mr. Salazar's Facebook ID. *id.*, ¶¶ 32-35, 39-43, 48, 62, 66.

- 247 is a "video tape service provider." *id.*, ¶¶ 2, 13, 25, 59-60.

- 247 "knowingly disclosed" Mr. Salazar's "personal identifiable information" by installing the Facebook Pixel on its web properties and allowing the Facebook Pixel to capture and share Salazar's personally identifiable information with third parties. *id.*, ¶¶ 4, 32, 62, 66.

- Mr. Salazar is a "consumer" of a "good of service." *id.*, ¶¶ 46-47, 58, 63.

Through its unlawful conduct, Paramount violated the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), which prohibits anyone in the business of selling, renting, or delivering videos from disclosing information capable of identifying its subscribers and the video materials they request or obtain without their informed, written consent. Despite its efforts, nothing in Paramount's motion to dismiss changes these straightforward facts. As such, Defendant's motion must be denied in full so that the parties can begin discovery in earnest.

---

[3] The following order was issued since Defendant filed its motion to dismiss: *Belozerov v. Gannett Co.*, No. 22-cv10838, 2022 WL 17832185 (D. Mass. Dec. 20, 2022). The following orders were issued prior to Defendant filing its motion to dismiss.; *Epoch Times*, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022); *Lebakken v. WebMD*, LLC, No. 1:22-cv-644, 2022 16716151 (N.D. Ga. Nov. 4, 2022); *Boston Globe Media Partners LLC*, 2022 WL 4329373. *See also Louth v. NFL Enters. LLC*, No. 1:22-cv-405, 2022 WL 4130866 (D.R.I. Sept. 12, 2022) (Google Pixel). Defendant has chosen to only cite the *WebMD* decision in its motion. ECF No. 17, at 14 n.12.

## LEGAL STANDARD ON FED. R. CIV. P. RULE 12(b)(6) MOTION TO DISMISS

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

This Court has recognized:

> On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 433 (6th Cir. 2008). That is not to say that the movant has some evidentiary burden; as should be clear from the discussion above, evidence (as opposed to allegations as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of explanation; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

*Franchi v. SmileDirectClub, Inc.*, No. 3:19-CV-00962, 2022 WL 4594575, at *5 (M.D. Tenn. Sept. 30, 2022).

## ARGUMENT

This case is materially identical to a number of cases that recently survived defendants' attempts to have the cases dismissed at this early stage. *See* supra n.3. Rather than fully address these orders, Defendant instead argues inapplicable and outdated caselaw, seeks inferences to be drawn in its favor, and overlooks Plaintiff's well-pleaded allegations. As discussed below, Plaintiff has plausibly pleaded his VPPA claim as well as a concrete and particularized injury via his claim for damages and injunctive relief due to Defendant's unlawful disclosure of his personal information without written consent.

3

**A.    Plaintiff Has Plausibly Pleaded His VPPA Claim.**

**1.    Paramount is a Video Tape Service Provider as defined in the VPPA.**

Under the VPPA, a "video tape service provider" is one "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). A consumer is "any renter, purchaser, or subscriber of goods or services from a video tape services provider." *Id.* § 2710(a)(1). As noted above, Mr. Salazar has plead both that he is a consumer, ECF No. 1, ¶¶ 46-47, 58, 63, and that Paramount is a "video tape service provider." *Id.*, ¶¶ 2, 13, 25, 59-60.

In its attempt to narrow the definition of "video tape service provider," Defendant relies on *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204 (C.D. Cal. 2017). ECF No. 17, at 9.[4] *In re Vizio*, however, does nothing to place Defendant's video-laden website outside the reach of the VPPA. While the *Vizio* court notes the definition is not unbounded,[5] it by no means wrings all meaning out of the term as Defendant argues here. The *Vizio* court acknowledged that "a defendant can be 'engaged in the business' of delivering video content even if other actors also take part in the delivery of the same video content," so long as "the defendant's product [is both] substantially involved in the conveyance of video content to consumers [and] significantly tailored to serve that purpose." 238 F. Supp. 3d at 1221. In so stating, the court held that a provider of "Smart TVs" that were "designed to enable consumers to seamlessly access Netflix, Hulu, YouTube, and Amazon Instant Video content in their home"

---

[4] Defendant also appears to write a "news content" exception into the VPPA. ECF No. 17, at 9. The courts' recent decisions in *Gannett*, *Epoch Times*, and *Boston Globe* fully extinguish this argument. *See supra* n.3. *See also In re Hulu Privacy Litig.*, No. C 11-3764, 2012 WL 3282960, at *2 (N.D. Cal. Aug. 10, 2012) (describing the video content at issue as "news, entertainment, educational, and general interest programs" and finding plaintiff's VPPA claim actionable and denying Hulu's motion to dismiss).

[5] *In re Vizio*, 238 F. Supp. 3d 1204 ("There is some authority for the proposition that not all who deliver videos are in the business of doing so.")

was sufficiently alleged to be a "video tape service provider" within the meaning of the VPPA. *Id.* at 1222. There can be no doubt that a media giant like Paramount qualifies as a video tape service provider. The courts that have recently weighed such allegations have found them to sufficiently plead a VPPA claim.[6]

Defendant further tries to render the term "video tape service provider" meaningless by arguing "the VPPA specifically contemplates the distribution of physical goods sold by video rental stores, namely 'prerecorded video cassette tapes or similar audio visual materials.'" ECF No. 17, at 9 (quoting 18 U.S.C. § 2710(a)(4)). "[A] plain reading of a statute that covers videotapes and 'similar audio visual materials' is about the video content, not about how that content was delivered (*e.g.*, via the Internet or a bricks-and-mortar store)." *In re Hulu Privacy Litig.*, No. C 11-3764, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012).[7] Likewise, Defendant's attempt to conscript the "rule of lenity" warrants little, if any, consideration as there is no ambiguity in the VPPA provisions at issue here.[8]

For purposes of the VPPA, and drawing all reasonable inference in Plaintiff's favor, Paramount is a "video tape service provider."

---

[6] *See*, *e.g.*, *Epoch Times*, 2022 WL 17069810, *4 ("'[D]rawing all reasonable inferences in the plaintiff's favor,' it is reasonable to infer that Plaintiff consumed prerecorded content of the variety specifically identified in the Complaint.") (citation omitted).
[7] *See also Ambrose v. Boston Globe Media Partners LLC*, No. 21-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022); *In re Vizio, Inc.*, 238 F. Supp. 3d at 1221 ("Congress's use of the phrase 'similar audiovisual materials' indicates that the definition is medium-neutral; the defendant must be in the business of delivering video content.")
[8] *See Sterk v. Redbox Automated Retail, LLC*, 806 F. Supp. 2d 1059, 1069-71 (N.D. Ill. 2011) (quoting *Reno v. Koray*, 515 U.S. 50 (1995) and *Moskal v. United States*, 498 U.S. 103 (1990), *rev'd on other grounds*, *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535 (7th Cir. 2012).

5

## 2. Mr. Salazar has plausibly plead that he is a "consumer" of a "good or service" under the VPPA.

The VPPA defines "consumer" as "any *renter*, *purchaser*, or *subscriber* of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added). Paramount attempts to evade this language by arguing that while Mr. Salazar "characterizes himself as a 'subscriber,' he does not actually subscribe to any video goods or services from 247sports.com." ECF No. 17, at 10. Defendant specifically argues the newsletter is merely "marketing content" that "does not come within the statute's ambit." *Id.* This self-serving argument, as discussed below, has been expressly and repeatedly rejected.

In *WebMD*, the court expressly rejected this very argument:

> The Court agrees with [plaintiff] on this point. To constitute a "consumer" under the VPPA, the plaintiff must subscribe to "goods or services from a video tape service provider," not a video service as WebMD attempts to frame the issue. Thus, the question here is whether WebMD's e-newsletter constitutes a good or service of a video tape service provider.

*WebMD*, 2022 WL 16716151, at *3 (record citations omitted). The court went on to conclude that the plaintiff had "plausibly pleaded that WebMD's e-newsletter constitutes a good or service under the VPPA." *Id.* Defendant is aware of these related VPPA cases,[9] as it attempts to distinguish WebMD,[10] yet has chosen to mostly ignore these strong opinions forming the body

---

[9] ECF No. 17, at 1 (referring to "a broader campaign by the plaintiff bar").

[10] ECF No. 17, at 14 n.12. In *WebMD*, the court distinguished the 11th Circuit's decisions in *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1255–58 (11th Cir. 2015) and *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1344 (11th Cir. 2017), as follows:

> Here, unlike in Ellis and Perry, Lebakken alleges more than just the free downloading of a mobile application onto her smartphone; she alleges that she exchanged her email address to receive the WebMD e-newsletter and that she also created her own WebMD account. Because the Eleventh Circuit in Ellis expressly contemplated "newsletters . . . that a user can sign up for (i.e., subscribe to) and receive for free," the Court finds that Lebakken has adequately pleaded that she was a subscriber under the VPPA. *Ellis*, 803 F.3d at 1256.

*WebMD*, 2022 16716151, at *2 (record citations omitted).

of Pixel-VPPA caselaw. *See supra* n.3. Instead, Defendant cites years-old cases that are distinguishable from the facts of this matter and relies on recently-rejected arguments.

For example, Paramount relies heavily on *Austin-Spearman v. AMC Network Entm't LLC*, 98 F.Supp.3d 662 (S.D.N.Y. 2015), for the proposition that the VPPA does not extend to newsletter content. ECF No. 17, at 12. This is the identical argument the *WebMD* court handily rejected prior to defendant filing its motion here:

> WebMD essentially argues that Lebakken providing her email address to WebMD to subscribe to the e-newsletter in 2017 is too attenuated from her viewing of any WebMD videos to state claim under the VPPA. Specifically, WebMD argues that although the First Amended Complaint alleges that WebMD "frequently features its video content through its email newsletter," Lebakken never actually alleges that she ever accessed any of the videos featured in the e-newsletter. *The question here, however, is not whether Lebakken alleges that she viewed the videos embedded within the e-newsletter but rather whether the e-newsletter constitutes a good or service to which Lebakken subscribed.*

*WebMD*, 2022 16716151, *3 (emphasis added) (internal citations omitted). Mr. Salazar is positioned identically to the *WebMD* plaintiff. *See* ECF No. 1, ¶¶ 4, 12, 20, 32, 46-47, 62, 66.

Paramount's reliance on *United States v. Shultz*, No. 16-10107-01-EFM, 2018 WL 534333 (D. Kan. Jan. 24, 2018), is equally misplaced. ECF No. 17, at 12. In *Shultz*, a criminal defendant in a child pornography case attempted to use the VPPA to suppress evidence the government obtained through non-party subpoenas comprising "names, addresses, IP addresses, telephone numbers, credit cards, and internet usage information such as log-in times and duration," but he did "not allege that the Government sought or received any information relating to video services or video materials obtained or requested." *Id*. at *3. The issue in that case, as Paramount itself acknowledges, was whether "the VPPA may be violated . . . by identifying a person as having requested or obtained any service from a video tape service provider . . . regardless of whether the consumer requested or obtained audio visual materials." ECF No. 17, at 12 (quoting *Shultz*, 2018 WL 534333, at *3). Here, Mr. Salazar specifically alleges that he

7

requested, and Paramount delivered, video contact that was viewed on the www.247Sports.com website, and that Paramount later disclosed what video content he watched to Facebook without proper consent. ECF No. 1, ¶¶ 4, 32-35, 39-43, 48, 62, 66. *Shultz* is, therefore, wholly inapposite.

Paramount next argues that the VPPA does not cover written materials such as "library borrower records" or "patrons" that requested materials from a library. ECF No. 12, at 12-13 (citing S. Rep. No. 100-599 and 134 Cong. Rec. S5397-10 (1988)). This argument is puzzling and seems out of place as the Complaint's allegations are based on Paramount's unlawful disclosure of personally identifiable information (information that identifies Plaintiff as having requested specific *video* material from www.247Sports.com); the Complaint is not based on Plaintiff's library rentals or anything remotely akin.

Paramount further points to an amalgam of state analogs to the VPPA – none of which are pleaded in the Complaint or are at issue here. Setting aside the obvious fact that this is a VPPA claim, the fact remains that the state privacy statutes have their own definitions and are not identical in scope. *Compare* Mich. Comp. Laws Ann. § 445.1711(a) *with* Tenn. Code Ann § 47-18-2203 (different definitions). While the statutes have similar aims, any argument directly comparing statutes that cover more than video privacy are irrelevant here, as this is a VPPA case.

In short, Mr. Salazar has adequately plead he is a "subscriber," and therefore, a "consumer" under the VPPA.

### 3. The Facebook ID – on its own – constitutes PII.

Paramount next argues that Mr. Salazar has "not plausibly allege[d] that Paramount disclosed PII." ECF No. 17, at 15. In support of is contention, Paramount asserts that "[t]he only identifying information he alleges was disclosed to Facebook is his [Facebook ID]." *Id*. (citing ECF No. 17, ¶¶ 5, 48). Yet, courts have repeatedly found that the Facebook ID constitutes PII.

8

For example, in *Epoch Times,* the court recently provided a concise summary of the state of the law directly undermining what Paramount argues here:

> Unlike the anonymized device serial numbers disclosed in *Robinson*, Facebook need not link the disclosed FID to personal information obtained elsewhere. The FID itself represents a particular individual. Indeed, Defendant fails to acknowledge that *Robinson* itself distinguished FIDs from the sort of device serial number disclosed by Disney in *Robinson*: "Nor is the information disclosed by Disney equivalent to a Facebook ID. . . . A Facebook ID . . . is thus equivalent to a name—it stands in for a specific person, unlike a device identifier." This view is consistent with courts in other district that have considered the very same question.

*Epoch Times,* 2022 WL 17069810, \*3 (citations omitted).[11]

Just as in these other Pixel-VPPA cases, Mr. Salazar has plausibly plead that Paramount knowingly disclosed his PII to a third party in violation of the VPPA. ECF No. 1, ¶¶ 32-35, 39-43, 48, 62, 66. Paramount is a sophisticated entity that "operates a multinational media conglomerate." ECF No. 1, ¶ 13. While a fully-developed record may demonstrate that Paramount was an unwitting dupe of Facebook, at this juncture the plausibly plead allegations are adequate "to state a viable claim under the VPPA." *Boston Globe*, 2022 WL 4329373, \*2.

**B.     Paramount knowingly held the door open for Facebook to walk right in and access Mr. Salazar's PII.**

Additionally, Paramount argues that Plaintiff has not plead that Paramount knowingly disclosed Mr. Salazar's PII. ECF No. 17, at 16-18. With the precision of a blunderbuss, Paramount argues that it could not know what information the Pixel would disclose, and it did not understand that each person's unique Facebook ID would identify website users to Facebook. Yet, as the Complaint makes clear, ECF No. 1, ¶¶ 4, 32, 62, 66, and the *Epoch Times* court makes plain, "[b]y installing the Pixel, Defendants opened a digital door and invited Facebook to

---

[11] *See also id.* at \*4; *Gannett*, 2022 WL 17832185, at \*4; *WebMD*, 2022 16716151, \*5; *Patreon,* 2022 WL 7652166, \*8; *Boston Globe*, 2022 WL 4329373, \*2.

enter that door and extract information within." *Epoch Times*, 2022 WL 17069810, *3 (citing *In re Hulu Priv. Litig.*, No. 11-cv-3764, 2014 WL 1724344, *14 ("Throwing Judge Bork's video watch list in the recycle bin is not a disclosure. Throwing it in the bin knowing that the Washington Post searches your bin every evening for intelligence about local luminaries might be.")). It is implausible that Paramount did not know how the Pixel operated when installing it on its website. Plaintiff has pleaded as much. ECF No. 1, ¶¶ 4, 32, 62, 66.

However, Paramount invites the Court to assume that it simply has no idea what it installs on its website or how it works. ECF No. 17, at 18. Even if that assumption were not directly contradicted by the Complaint's well-pleaded allegations, it would amount to no more than speculation in Paramount's favor untethered from all ordinary expectations and common sense. It is implausible that profit-generating enterprises operate without any notion of what it is they are doing. Because the Court's review is confined to the Complaint's well pleaded allegations and all reasonable inferences to be drawn from them in Plaintiff's favor, the Court must decline Paramount's invitation to ignore Plaintiff's allegations and speculate unreasonably in its favor at this juncture.

**C.**     **Mr. Salazar has standing to pursue the VPPA claims.**

      **1.**     **The harm Mr. Salazar has alleged is concrete and particularized.**

In arguing that Mr. Salazar lacks Article III standing, Defendant relies on a misguided and contorted interpretation of *TransUnion v. Ramirzez,* 141 S. Ct. 2190 (2021). Tucking this threshold issue into the backend of its brief provides some measure of just how little faith Defendant places on its standing arguments.

There can be no doubt that Plaintiff has pleaded cognizable harm and Article III standing. Mr. Salazar alleges, *inter alia,* Defendant (i) violates the VPPA by disseminating Plaintiff and putative class members' Personal Viewing Information such that they "cannot exercise

reasonable judgment to defend themselves against the highly personal ways 247Sports.com has used and continues to use data is has about them to make money for itself"; (ii) to the "detriment of their legally protected privacy rights," in a manner which (iii) "undeniably reveals their identity and the specific video materials they requested from Defendant's website." ECF No. 1, ¶¶ 7, 11, 43. These allegations more than satisfy standing requirements, particularly at the pleading stage, and Defendant's Rule 12(b)(1) argument must be rejected.

It has long been settled that VPPA claims provide Article III standing. In so holding, courts around the country have uniformly recognized that claims brought under the statute are brought to remedy concrete, particularized injuries because VPPA claims require the disclosure of personal information. *See Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017) (holding a plaintiff satisfies the concreteness requirement of Article III standing where he alleges a violation of the VPPA for a wrongful disclosure, because "Supreme Court precedent has recognized in the privacy context that an individual has an interest in preventing *disclosure* of personal information). (emphasis in original); *Id*. at 1340 ("We conclude that violation of the VPPA constitutes a concrete harm.") (citations omitted); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("the VPPA identifies a substantive right to privacy that suffers any time a video service provider discloses otherwise private information"); *In re Nickolodeon Consumer Privacy Litig.*, 827 F.3d 262, 273-74 (3d Cir. 2016) ("the purported injury here is clearly particularized, as each plaintiff complains about the disclosure of information relating to his or her online behavior. While perhaps 'intangible,' the harm is also concrete in the sense that it involves a clear *de facto* injury, *i.e.,* the unlawful disclosure of legally protected information.")

Specifically, the court considered the issue and likewise observed that "every court to have addressed this question" has found the "VPPA creates a right to the privacy of one's video-

watching history, the deprivation of which–through wrongful disclosure, or statutory violation, alone–constitutes an injury sufficient to confer Article III standing." *Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662, 666-67 (S.D.N.Y. 2015) (collecting cases).

Defendant does not cite a single case holding otherwise, but nevertheless seeks to hitch a ride on *TransUnion* and persuade the Court that Plaintiff does not have standing to pursue his VPPA claim on behalf of a putative class. To be sure, *TransUnion* – a debt collection case – drew a bright line between those claims alleging a mere *risk* of future harm and the actual separate concrete harm itself; the Supreme Court held that "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm – at least unless the exposure to the risk of future harm itself causes a *separate concrete* harm." *Ward v. Nat'l Patient Account Servs. Solutions*, 9 F.4th 357, 361 (6th Cir. 2021) (quoting *TransUnion*, 141 S. Ct. at 2210-11) (emphasis added). Materially, in *TransUnion*, the Court carefully parsed out class members whose credit reports containing alerts were disseminated to third-party businesses as those who had suffered a concrete injury in fact as required for Article III standing, as opposed to those consumers who had misleading alerts in their credit files that were *not disseminated* to third-party businesses. 141 S. Ct. at 2209. The Court concluded that the plaintiffs whose misleading information was not disseminated did not suffer a concrete harm and held: "[n]o concrete harm, no standing." *Id.* at 2213.

Here, Plaintiff has identified a concrete and particularized harm, just like all the VPPA plaintiffs to precede him where courts in the pre-*TransUnion* era concluded Article III standing had been pled. Defendant routinely violates the VPPA by knowingly disclosing Plaintiff's and putative class members' Personal Viewing Information to Facebook, a third party, thereby revealing their identities and the specific video materials they requested from Defendant's

website. This is precisely the type of concrete, particularized harm of which the Supreme Court approved in *TransUnion* when it drew its bright line on standing. To Plaintiff's Counsel's knowledge, no court ever *not* found VPPA standing in an unlawful disclosure case.

And again, while no court has yet considered VPPA standing in the post-*TransUnion* era, courts considering analogous case theories and statutes and applying *TransUnion* have concluded that plaintiffs asserting a claim for the nonconsensual dissemination of their private information inflicts a concrete and particularized harm that confers Article III standing. *Bohnak v. Marsh & McLennan Cos., Inc.*, 580 F. Supp. 3d 21, 30 (S.D.N.Y. 2022) (plaintiffs had standing in data-breach case because "disclosing [private] information to third parties without authorization or consent could plausibly be offensive to a reasonable person" even though "[public disclosure of private information did] not provide a perfect analog" to claim at issue because "common-law analogs need not provide 'an exact duplicate' of a "traditionally judicially cognizable intangible harm."); *see also Al-Ahmed, v. Twitter*, No. 21-CV-08017-EMC, 2023 WL 27356, at *6 (N.D. Cal. Jan. 3, 2023) (plaintiff's injury should not be rejected at pleading stage "because the privacy of his information is still in debate.").

Persuasively, a district court in this circuit – in the context of a similarly-aimed state privacy statute – recently rejected the standard arguments Defendant presses here:

> Where, as here, the harm alleged is intangible, "'it is instructive to consider whether [that harm] has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.'" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 341).

> The Court of Appeals for the Sixth Circuit, as well as several district courts, have rejected the argument that AIA raises here. They have concluded that an individual like Krassick has standing to pursue a PPPA claim. In *Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017), the Court of Appeals held that the plaintiff had standing to pursue a PPPA claim because "the violation at issue" involved "the privacy in one's reading materials." *Id.* at 121 (citing *Perlin v. Time Inc.*, 237 F. Supp. 623, 627-29 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc.*,

235 F. Supp. 3d 868, 873-75 (E.D. Mich. 2017); *Boelter v. Hearst Commcns*, Inc., 192 F. Supp. 3d 427, 437 (S.D.N.Y. 2016)). Moreover, "the right guaranteed by the [PPPA] is similar in kind to other privacy rights that were gradually recognized by American courts over the course of the last century[.]" *Perlin*, 237 F. Supp. 3d at 641. Consequently, the disclosure of an individual's private reading information in violation of the PPPA "is a cognizable injury in fact for purposes of Article III standing." *Coulter-Owens*, 695 F. App'x at 121.

*Krassick v. Archaelogical Inst. of Am.*, No. 2:21-cv-180, 2022 WL 2071730, at *2 (W.D. Mich. June 9, 2022).[12] The court added that these "cases are persuasive" and specifically noted that Defendant "does not discuss any of them in its briefing." *Id*. at *3.

Like the defendant in *Krassick*, Paramount has chosen not to address a single one of these cases. Instead, Defendant cites a raft of FDCPA cases that are readily distinguishable from the claims and allegations and the posture of the case here. *See Stewart v. Healthcare Revenue Recovery Group, LLC*, No. 3:20-cv-679, 2022 WL 200371, at *17 (M.D. Tenn. Jan. 21, 2022) (noting at summary judgment, the court noted "plaintiff here does not allege or present facts suggesting that any actual person saw or read any private information concerning her or her

---

[12] In *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666 (E.D. Mich. 2022), the district court discussed the analogous Michigan Preservation of Personal Privacy Act which, like the VPPA, had always conferred Article III standing. *Id*. at 677 (citing cases). The court found defendant's reliance on *TransUnion* "misplaced":

> In *TransUnion*, the Supreme Court considered whether two groups of class members bringing claims under the Fair Credit Reporting Act suffered a concrete injury in fact under Article III. *Id*. at 2208-13. The first group of class members had a misleading credit report "disseminated to third parties." *Id*. at 2208-09. The second group merely had a misleading remark on their credit files that was not disseminated to a third party. *Id*. at 2209. The *TransUnion* Court held that the first group suffered a concrete injury in fact under Article III. *Id*. ("In short, the 1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III.").

> Likewise, Plaintiffs allege that their "Private Reading Information" was disclosed to third parties without their consent. . . . In this way, *TransUnion reinforces that Plaintiffs' PPPA claims have Article III standing*.

*Pratt*, 586 F. Supp. 3d at 677 (emphasis added).

daughter."); *Sputz v. Alltran Fin., LP*, No. 21-cv-4663, 2021 WL 5772033, at *4 (S.D.N.Y. Dec. 5, 2021) (noting at motion to dismiss that "Plaintiff does not allege that anyone had read [his] information rather than merely processed it, or that there's otherwise been publicity."); *McCallahan v. Medicredit, Inc.*, No. 3:19-cv-163, 2020 WL 6204419, at *10 (M.D. Tenn. Oct. 22, 2020) (noting at summary judgment, "there is no evidence to suggest that Medicredit procured here financial or medical information through improper means, nor is there anything in the record to suggest that Medicredit did not have a legal right to possess this information."). Likewise, the Eleventh Circuit's decision in *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236 (11th Cir. 2022), another FDCPA case, involved the same facts – the hiring of a commercial mail vendor by a debt collector – and is likewise distinguishable insofar as that it was an FDCPA letter case that focused on Defendant's intent as a factor in its standing inquiry. *Id*. at 1246. *Hunstein*, when read properly, supports a finding of standing here. *See Rendon v. Cherry Creek Mortg, LLC*, No. 22-CV-01194-DMS-MSB, 2022 WL 17824003, at *4 (S.D. Cal. Dec. 20, 2022) (finding that *Hunstein* supports standing when based upon intrusion upon seclusion and noting "party complaining of intrusion upon seclusion is likewise harmed when their private information is accessed. The harm here is the same. Whether or not the intrusion was intentional does not impact the severity of harm. Accordingly, the alleged harm suffered by Plaintiff is sufficient 'in kind' to the harm suffered by intrusion upon seclusion.").

By contrast, Plaintiff here plainly alleges that, because of Defendant's conduct, Facebook was able to use their data to the detriment of their privacy rights, ECF No. 1, ¶¶ 7-8, leaving no doubt that their private information is not only seen but used in ways they would not have

allowed and which caused concrete and particularized harm. Accordingly, Plaintiff has plainly alleged standing under Article III and *TransUnion.*[13]

## 2.    There is No Content Exception in the VPPA.

In seeking to dismiss Plaintiff's VPPA claim, Defendant seeks to impose a content requirement that is not present in the statute. Specifically, Defendant argues that there is nothing "about [Plaintiff's] college-sports-news watching habits [that] could be offensive to a reasonable person." ECF No. 17, at 21. This is the reddest of red herrings. The standard Defendants seeks to impose here as long since been rendered inapplicable and inappropriate in the context of a VPPA claim:

> The VPPA's history shows why an allegation of additional harm is unnecessary. Congress enacted the VPPA after a newspaper published Supreme Court nominee Robert Bork's video rental history. Notably, Judge Bork's rental history was decidedly commonplace, and the article did not hurt his nomination. Case Comment, Statutory Interpretation—*The Video Privacy Protection Act—Eleventh Circuit Limits the Scope of "Subscriber" for VPPA Protections—Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015), 129 Harv. L. Rev. 2011, 2018-19 (2016). Were we to accept Defendant's argument regarding standing, the VPPA would not provide legal recourse to those in the precise situation that prompted the statute's enactment in the first place.

*Eichenberger*, 876 F.3d at 984 n.2.[14] "The VPPA does not protect only against harms such as embarrassment and harassment—as Defendant argues. Rather, the statute also protects privacy interests more generally by ensuring that consumers retain control over their personal

---

[13] Defendant's references to consent at the conclusion of its argument are not relevant to standing; in any event, Plaintiff expressly alleges that the privacy disclosure excludes any reference to Defendant sharing private information with Facebook. *See* ECF No. 1, ¶¶ 27-29.

[14] *See also* Steven Advokat, *Publication of Bork's Video Rentals Raises Privacy Issue*, CHI. TRIB., Nov. 20, 1987 ("The films were general releases such as 'Ruthless People,' 'The Man Who Knew Too Much' and 'A Day at the Races'; there were no X-rated rentals."), *available at* https://www.chicagotribune.com/news/ct-xpm-1987-11-20-8703270590-story.html (last visited Jan. 5, 2023).

information." *Id.* at 983 (citing S. Rep. No. 100-599, at 6-7). The Court should reject Defendant's invitation to amend the VPPA.

### 3. Paramount's Browsewrap "Privacy Policy" Has No Application Here.

Paramount's brief is rife with references to the "Privacy Policy" that is "posted" on the 247Sports.com webpage. However, the mere posting of a tiny link on the footer of a webpage is insufficient notice by any measure of the caselaw.

District Courts in this Circuit have "focused on whether the website user has actual or constructive knowledge of a site's terms and conditions prior to using the site." *Walker v. Nautilus, Inc.*, 541 F. Supp. 3d 836, 841 (S.D. Ohio 2021) (quoting *Snap-on Business Solutions v. O'Neil & Associates*, 708 F. Supp. 2d 669, 681 (N.D. Ohio 2010)). For a browsewrap agreement to be enforceable, courts have found that a website's users have constructive knowledge of browsewrap terms of use where the website host has placed notice of the terms "prominently" and provided "easy access" to the full terms. *See Freeplay Music v. Dave Arbogast Buick-GMC*, No. 3:17-cv-42, 2019 WL 4647305, at *10-11 (S.D. Ohio Sept. 24, 2019); *Snap-on Business Solutions*, 708 F. Supp. 2d at 682.

This matter is analogous to *Walker* and requires the same finding – there is no notice or assent to the Privacy Policy. In denying a motion to compel arbitration, the *Walker* court started by noting:

> Courts have refused to enforce browsewrap terms of use where the website's users were required to scroll down the webpage to discover the terms. *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 20 (2d Cir. 2002) (Sotomayor, J.); see also *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014); *Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028, 1038 (W.D. Wash. 2018). In *Specht*, the Second Circuit reasoned that the "reasonably prudent internet user" would not have learned of the terms before downloading software from the website and was not provided "reasonable notice" of the terms. *Specht*, 306 F.3d at 20. There, the plaintiffs' act of downloading software thus "did not unambiguously manifest assent to the arbitration provision contained in the license terms." *Id.*

*Walker*, 541 F. Supp. 3d at 841.

Analyzing the website at issue in *Walker*, the court found that the inconspicuous nature of the Terms of Service "not easily accessible." *Id*. Further, the hyperlink at issue "appears in small, faint gray letters at the bottom of the webpage" and were at the bottom of very long webpages. *Id*. Accordingly, *Walker* found that "[a] reasonably prudent internet user would not have learned of these terms of use before purchasing fitness equipment…." *Id*. As such, the plaintiff "did not assent to the browsewrap terms of use[.]" *Id*. at 842.

Similarly, here, the 247Sports.com webpage's purported Privacy Policy is relegated to the footer of a very long webpage, in arguably the smallest font on the website, and is set forth in light gray text that is hard to read against the white background of the page. Declaration of Brandon Wise ("Wise Decl.") in Opp'n to Mot. to Dismiss, Exs. A-D (Jan. 6, 2023). There can be no doubt that Plaintiff "did not assent to the browsewrap" Privacy Policy.

Furthermore, apparently realizing that its "posted" Privacy Notice was legally insufficient to provide proper notice, Paramount apparently altered its website on or around November 23, 2022 (seven days prior to filing its motion to dismiss). This alteration to the website is especially concerning because Paramount directs the Court to the now-altered website – without disclosure of recent alterations – and indicates that the now-altered website it should be considered in the disposition of Paramount's motion. ECF No. 17, at 4 n.3 (noting "[t]he Court can consider all of 247Sports.com because it is referred to in the pleadings"). As demonstrated in the attached Exhibits A through D in the Wise Declaration, it is clear that Paramount altered its website to more prominently advise webpage users that there is a document called "Paramount's Privacy Policy" and that those who sign up for the 247Sports Newsletter that "agreed to the Terms of

Use and acknowledge Paramount's Privacy Policy." For reference, an example of the difference is presented here:

| *What Paramount Directs the Court to:* | *What the Webpage Looked Like Until Nov. 23, 2022:* |
|---|---|
|  | |
| Screenshot of email widget on Jan. 6, 2023 from www.247Sports.com | Screenshot of email widget from archive.org ("Wayback Machine") of www.247Sports.com, dated Nov. 23, 2022, 08:48:32 |

Based on the browsewrap nature of the purported Privacy Policy and the fact that the 247Sports.com website and Privacy Policy have been altered post-Complaint, the Court should disregard any argument that relies on the "posted" "Privacy Policy.[15]

---

[15] Moreover, the Court should disregard any argument of assent to the Privacy Policy based on its reference in the Complaint. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017) ("As an initial matter, defendants argue that Meyer is precluded from arguing that no contract was formed by an allegation in his complaint that '[t]o become an Uber account holder, an individual first must agree to Uber's terms and conditions.' We disagree. First, as the district court observed, the pleading is not obviously a concession in that it makes no reference to Meyer's knowledge. *See Meyer*, 200 F. Supp. 3d at 413.") (record citation omitted).

### 4. Traceability

Defendant's "traceability" argument fares no better than its arguments that Mr. Salazar's injury is neither concrete nor particularized. Defendant engages in blatant plaintiff-blaming and misunderstands the facts of the case. At the outset, it must be noted – again – that Paramount installed (or directed the installation of the Pixel) on the 247Sports.com website. ECF No. 1, ¶ 4, 32, 62, 66. Thus, the statement that "to the extent the c_user cookie was deposited on Plaintiff's browser and transmitted to Facebook, it was only as a result of *Plaintiff's*" actions is simply untrue, and, at the pleading stage must be disregarded as a merits argument to be entertained at summary judgment after a record has been fully developed. The harm here is traceable to Paramount because if Paramount had not installed the Pixel on its website, therefore opening the digital door to Facebook – there would be no issue with unlawful tracking and data sharing between Paramount and Facebook. At its base, Defendant wrongly points the finger at Plaintiff instead of looking at its own actions, taking the allegations in the Complaint as true, and drawing all inferences in favor of Plaintiff.

Additionally, Defendant misstates that Plaintiff could have somehow avoided the Pixel's functionality by logging out of Facebook; not so. Once a Facebook user has logged in, the related cookies remain for between 90 and 365 days.[16] Defendant's assertion that "Plaintiff could prevent any transmission of the c_user cookie by simply logging out of Facebook" is simply incorrect and must be rejected.

Defendant's mischaracterization of the functionality of the Pixel and Plaintiff's alleged ability to "rebuke" Paramount's unlawful conduct dooms Paramount's traceability argument.

---

[16] *See* Cookies & other storage technologies, Facebook, available at
https://www.facebook.com/policy/cookies/printable (c_user cookie has "a lifespan of 365 days.")
(last visited Jan. 4, 2022).

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied in its entirety.[17]

Dated: January 6, 2023

Respectfully submitted,

By: /s/ *Rachel Schaffer Lawson*
Rachel Schaffer Lawson (Tenn. BPR No. 029376)
Dickinson Wright PLLC
424 Church Street, Suite 800
Nashville, TN 37219
Telephone: (615) 620-1715
Email: rlawson@dickinson-wright.com

Michael L. Murphy (*pro hac vice*)
BAILEY GLASSER LLP
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
Telephone: (312) 444-0734
Email: mmurphy@baileyglasser.com

Brandon M. Wise
PEIFFER WOLF CARR
KANE CONWAY & WISE, LLP
73 W. Monroe, 5th Floor
Chicago, IL 60604
Telephone: (310) 444-0734
Email: bwise@peifferwolf.com

*Counsel for Plaintiffs*

---

[17] To the extent the Court grants Defendant's motion, Plaintiff respectfully requests that he be permitted to amend his complaint to address any issues the Court raises in its Order.

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that *Plaintiff's Opposition To Defendant's Motion To Dismiss* was filed in the court's CM/ECF system and that counsel of record will be served.

       By: <u>/s/ *Rachel Schaffer Lawson*</u>